UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-21332-Civ-LENARD
    (05-20318-Cr-LENARD)
MAGISTRATE JUDGE P. A. WHITE

NATHANIEL SIMPKINS,          :

          Movant,            :

v.                           :          REPORT OF
                                       MAGISTRATE JUDGE
UNITED STATES OF AMERICA,    :

          Respondent.        :
_____

## I.  Introduction

Nathaniel Simpkins has filed a pro se motion to vacate pursuant to 28 U.S.C. §2255, attacking his convictions and sentences, imposed after a jury verdict in Case No. 05-20318-Cr-LENARD, on all counts of a three-count Indictment, for conspiracy to commit armed bank robbery, in violation of 18 U.S.C. §371 (Count 1), armed bank robbery, in violation of 18 U.S.C. §2113(a) and (d) (Count 2), and possession of a firearm during commission of a felony, in violation of 18 U.S.C. §924© (Count 3).

This case has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2255 Proceedings in the United States District Courts.

The Court has reviewed Simpkins' motion and supporting memorandum (Cv-DE#s 1, 2), the government's response to order to show cause (Cv-DE#9), Simpkins' Reply (Cv-DE#14), the Presentence Investigation Report (PSI), the United States Court of Appeals' Opinion affirming Simpkins' judgment on direct appeal, and all pertinent portions of the underlying criminal file, including but not limited to Simpkins' Motion to Suppress his custodial statements (Cr-DE#35), a transcript of the suppression hearing (Cr-DE#75) and the trial Court's Order (Cr-DE#76) granting that motion, as well as the trial and sentencing transcripts located in the record on appeal. In addition, on March 24, 2009, the movant Simpkins filed seven

additional documents, Exhibits "A" through "G," described as "Documents and Transcripts Necessary for the Resolution of the Movant's §2255" (Cv-DE#17, docketed 3/25/09).[1]

## II.  The Movant's Stated Grounds for Relief

In his motion (Cv-DE#1), Simpkins raises four grounds for relief, as follow:

1.   Ineffective assistance of counsel.

---

[1]    Simpkins describes the Exhibits A-G, as indicated below in regular type. The nature of the documents is indicated in bold type, in brackets.

"1. Exhibit (A) 16 pages for Movant's 2255 Ground 1(e) & (h)." **[This consists of a 16 page sworn statement from Curtis James Brown, given at Miami-Dade Police Headquarters on 8/26/2004]**

"2. Exhibit (B) 5 pages for Movant's 2255 ground 1(e)" **[This consists of:  (a) an "Advice of Rights" form signed by Curtis Brown on 8/26/04, signed by FBI Agents, James B. Hughes and Robert Erickson; and (b)-(e) four-pages of notations dictated 9/1/04, and typed 11/12/04, bearing Agents Hughes' and Erickson's initials, summarizing Curtis Brown's statement to police]**.

"3. Exhibit (C) 3 pages for Movant's 2255 Ground 1(h)" **[This consists of: "Government's Notice of Intent to Rely on Evidence of Prior Bad Acts Pursuant to Fed.R.Evid. 404(b)," dated 6/14/05, in Case No. 05-20318-Cr-LENARD]**.

"4. Exhibit (D) 11 pages for Movant's 2255 Ground 3" **[This consists of: pp.134-137 and 183-222 of the Trial Transcript in Case No. 05-20318-Cr-LENARD, transcribed 4 pages per sheet].**

"5.  Exhibit (E) 3 pages for Movant's 2255 Ground 1(d)" **[This consists of copies of a 5/7/04 Order in Dade Circuit Court Case F04-10116, <u>State v. Jerry Ponder and Curtis Brown</u>, ordering return of $1,970.00 cash in police case #175359C from Miami-Dade Police Department; and a 2-page police report bearing case #175359C]**

"6. Exhibit (F) 1 page for Movant's 2255 Ground 1(f)" **[This consists of: page 265 of the Trial Transcript in Case No. 05-20318-Cr-LENARD]**

"7. Exhibit (G) 1 page for Movant's 2255 Ground 1(f)" **[This consists of: page 1 of "Government's Response to the Standing Discovery Order," captioned in Case No. 05-20318-Cr-LENARD]**

     2.    Malicious Prosecution.

     3.    Due Process Violation.

     4.    Fifth Amendment Violation.

In his supporting Memorandum (Cv-DE#2), as sub-claims of ground One, Simpkins lists several challenges to counsel's effectiveness, framed essentially, as follow:

    a.    "Counsel should have challenge[d] the Indictment," since evidence that was considered by the grand jury in returning its indictment [Simpkins' statements to police on July 9, 2004, admitting involvement in the Union Planters Bank robbery] was ultimately suppressed because circumstances under which Simpkins was detained and questioned amounted to a Fourth Amendment violation.

    b.    "Counsel should have filed a motion to dismiss the Indictment due to the...Fourth Amendment violation," because evidence [Simpkins' inculpatory police statement] which formed a basis for the Indictment was suppressed and was not "available for the trial jury to examine...," and according to the movant Simpkins there was therefore "no evidence to support the indictment."

    c.    "Counsel should have argued and filed a motion on the fruit of the poisonous tree doctrine against everything that was used against the defendant [Simpkins] at trial," because "everything that was used was obtained after July 9, 2004," the date when "Agent James B. Hughes misled local police" by telling them "in reasons he explained that he had probable cause for the arrest of the Defendant."

    d.    "Counsel failed to introduce evidence of Reasonable doubt that was present within the discovery the government provided." According to the movant Simpkins, this "evidence of reasonable doubt" was that there existed a person named Jerry Lester Ponder, identified as being 6'1" tall, 210 pounds, with "very long dreads," who was a good friend of Simpkins' co-defendant Curtis Brown, and that Ponder and Brown "went to jail together in a drug

sting shortly after the crime [the Union Planters Bank Robbery] was committed." Movant Simpkins argues that if counsel had introduced this as evidence at trial, it "could have put doubt in the jury's head that the accused [Simpkins] did not commit the crime [the robbery at Union Planters Bank], and that the government's witness [Brown] was protecting his friend [Ponder]."

e.    "Counsel lied to Simpkins by stating that he could not impeach Curtis Brown with the transcripts of the audio recorded confession Curtis Brown gave the police;" and, according to movant Simpkins, counsel should have attempted to impeach Brown, because Brown testified that rough notes on an FBI 302 form were merely an interpretation of what he [Brown] had told Agents James B. Hughes and Robert Erickson on 8/26/04 at 3:20 p.m., while he [Brown], at 8:50 p.m. on 8/26, "provid[ed] police with a recorded audio statement completely excluding himself from all Bank Robbing activities."

f.    Counsel "should have objected to the answer of Government witness Curtis Brown on page 265 of [trial] transcripts concerning [Brown's] plea agreement and providing information, whether in interviews before a Grand Jury, or appearing at such Grand Jury proceeding," in order to impeach Brown for perjuring himself; because, according to movant Simpkins, Brown, when he was asked by police about bank robbery activities, had "express[ed] that he knew the individuals involved with the conspiracy and that he knew certain information about the conspiracy [to rob Union Planters Bank]", yet Brown had told police on August 26, 2004, that "[I] don't do shit like that;" and government information which was disclosed on June 17, 2005 showed that Brown had been the getaway driver in a bank robbery one month before the Union Planters Bank robbery with which he, Simpkins, and others were charged.

g.    "Counsel refused to allow Defendant [Simpkins] to testify."

h.    "Counsel failed to introduce evidence that the government witness Curtis Brown committed perjury."

In ground Two, movant Simpkins contends that he was subjected to "Malicious Prosecution." He bases this argument on his claim that "the prosecution never had probable cause for arrest or detention of the defendant." According to Simpkins, the government argued in its Response opposing his motion to suppress, that Officer Starkey had told him that he was "free to leave," but that Starkey chose not to lie at the suppression hearing, and did not testify that he had told Simpkins he could go. According to Simpkins, Starkey was present with Agent Hughes when Hughes told him [Simpkins] that "he was not leaving until he provided something by any means necessary if [he] wanted to leave the room." According to movant Simpkins, Detective Garcia's suppression hearing testimony showed that the government tried to get him to lie. According to Simpkins, Garcia "told the Court that the defendant [Simpkins] was under arrest and not there voluntarily, because Starkey told him that." Simpkins reasons, therefore, that this "goes to show how agent Hughes had the defendant prosecuted without probable cause, just because he and he prosecutor wanted to convict someone."

In ground Three, movant Simpkins argues that he was subjected to a Due Process violation, due to the government's failure to "disclose other impeachment evidence." According to Simpkins, the government told the court that Jeff Jenkins, along with Curtis Brown, would testify to "the same prior acts" to be introduced "as inextricably intertwined evidence." Simpkins contends that when it found out that Jenkins would not testify to the same prior acts as Curtis Brown, the government "was suppose[d] to consider that turn of events as impeachment evidence." Simpkins contends that once the government knew that Jenkins would not testify about the "same prior acts" as Brown, they did not ask Jenkins about them, because if he "did change his mind about lying that would ultimately damage the credibility of Curtis Brown."

In ground Four, Simpkins contends that he was subjected to a Fifth Amendment violation. He states that he had undergone treatment for Hodgkins lymphoma, and argues that "Nobody made sure the defendant was competent to stand trial due to [that] condition

that is still currently threatening his life." He also argues that "an accused has a right to assist his counsel in defending himself, if he is competent." In support of this claim, Simpkins argues that "every officer of the Court involved in trying the case" knew that before trial he had been hospitalized for 30 days for treatment of the Hodgkin's disease. Simpkins states that the Court knew of the illness, as evidenced by pretrial motions for continuance. He argues that counsel allowed him to testify at the August 15, 2005 suppression hearing, because he felt he was competent to take the stand, but that in the weeks that followed, he told counsel that he was taking powerful drugs for "inflammatory problems and pain," and during a client-counsel interview "counsel stated he would not put defendant [Simpkins] on the stand at trial because he did not believe the defendant was competent to answer the prosecutor's questions without seeming like the defendant was sedated under the medication." According to movant Simpkins, "the Court never inform[ed] the defendant of his right to testify even if counsel was forcing him not to." According to Simpkins, "the Court never ask[ed] the defense" about his "current condition" and "illness," "so the court itself could be sure the defendant was competent to stand trial."

### III.  <u>Procedural History</u>

As noted above in Section I of this Report, on April 15, 2005, the movant Nathaniel Simpkins was charged by Indictment in Case 05-20318-Cr-LENARD with conspiracy to commit armed bank robbery [Count 1], armed bank robbery [Count 2], and possession of a firearm during commission of a felony [Count 3]. (Indictment, Cr-DE#1). The offenses charged related to robbery of Union Planters Bank ("UPB"), in Hialeah, on March 23, 2004. In excess of $30,000.00 was taken.

Based on a confidential informant's tip, and as part of an investigation into a series of bank robberies, Simpkins was stopped, transported to a police station, and questioned on July 9, 2004. He gave statements, including one implicating himself in the 3/23/04 UPB robbery. Simpkins later moved to suppress his statements (Motion, Cr-DE#35). On August 15, 2005, a suppression hearing was held before the Honorable Theodore Klein, United States Magis-

trate Judge. (Transcript, Cr-DE#75). Based on Judge Klein's recom-
mendation, and details in the transcript, the Court found that the
circumstances under which Simpkins was detained on July 9, 2004,
and questioned, leading to a confession, constituted an unlawful
seizure of his person, in violation of the Fourth Amendment, and
granted the motion to suppress his statements (Order, Cr-DE#76).

After Simpkins was tried to a jury, and was convicted on all
counts, he pursued a direct appeal, Eleventh Circuit Case No. 05-
17167, arguing that the District Court erred by:

> (1)   admitting testimony, as inextricably
>       intertwined with the instant charges,
>       that Simpkins had previously partici-
>       pated in a bank robbery other than the
>       one charged in the indictment;
>
> (2)   denying his motion for judgment of
>       acquittal, in which he argued that the
>       evidence, including the testimony of
>       two co-conspirators whom Simpkins says
>       were not credible, was insufficient to
>       convict him;
>
> (3)   denying his requst to call certain
>       witnesses in order to impeach his co-
>       defendant's testimony; and
>
> (4)   overruling his objections to the
>       government's closing arguments.

(See Cr-DE#156).   The Court of Appeals, in an unpublished
opinion, United States v. Simpkins, 240 Fed.Appx. 334, 2007 WL
2050914 (11 Cir. 2007), affirmed Simpkins' conviction on July 18,
2007, issued as its mandate on August 16, 2007. (Cr-DE#156).
Simpkins' motion to vacate was signed under penalty of perjury on
April 28, 2009, mailed on April 29, and timely filed with the Clerk
of this Court on May 6, 2008.

## IV.   Facts

Movant Simpkins and three co-conspirators, Curtis Brown,
Tinnell Prentice Irving, and Anthony Donnell Rose, were indicted
for conspiracy to commit the UPB robbery, and armed bank robbery at

the UPB. Simpkins, Brown, and Irving also were charged with use of
a firearm in furtherance of the offense. A fourth co-conspirator,
Jeffrey Jenkins, cooperated under a Kastigar letter,[2] which immu-
nized him from prosecution for the 3/23/04 UPB robbery (See
Simpkins' PSI, p.5, ¶8), and there was a fifth co-conspirator,
Jimmy O'Neal [Brown's cousin] who was not indicted (see PSI, and
Indictment Cr-DE#1). The Co-defendant Irving was arrested and plead
guilty after Simpkins' conviction. (Cr-DE#156, p.4, n.1).  Brown
and Rose plead guilty (Id., p.3). Witnesses called by the govern-
ment, who testified at Simpkins' trial, were: (1) Rolando Riera,
Jr., a UPB teller [ROA; Cr-DE#126, T/161-183]; (2) Jeffrey Jenkins
[Id., T/185-220]; (3) Jessica Alonso, a UPB teller supervisor [Id.,
T/221-225]; (4) Judy Russell [Id., T/225-243]; and (5) Curtis Brown
[Id., T/246-287]. Simpkins' attorney cross examined Jenkins [T/205-
218], Russell [T/s T/240-242], and Brown [T/268-283].

As discussed in the Eleventh Circuit's Opinion, the government
gave Simpkins notice before trial, pursuant to F.R.E. 404(b), of
its intent to introduce evidence that on March 3, 2004, just 20
days before the UPB robbery, Simpkins had participated in robbery
of another bank. Simpkins sought its exclusion, arguing failure of
the government to identify its reasons for offering the evidence
and its relevancy. The government responded that the close temporal
proximity of the two robberies was probative of identity, knowledge
and absence of mistake. The Court denied the motion to suppress the
proposed 404(b) evidence, without prejudice, noting that its rele-
vancy would depend on the theory of defense presented at trial.
Simpkins, at trial, objected to introduction of testimony about the
3/3/04 bank robbery, and the government argued that it intended to
offer testimony by Brown stating that in the UPB robbery Simpkins
agreed to be a driver, but did not want to be a gunman, because in
the earlier robbery he had been a gunman and felt that the small
amount he was paid did not justify the danger he would face if he
agreed to be a gunman in the UPB robbery. This, the government
argued, explained the relationships of the parties, and therefore

---

[2]    See Kastigar v. United States, 406 U.S. 441 (1972).

was not extrinsic evidence subject to exclusion under Rule 404(b).
The district court found that the evidence regarding the earlier
offense was "inextricably intertwined" with the charged offense;
noted, in the alternative, that the probative value of the evidence
outweighed any prejudicial value, and overruled the objection.

Riera testified that he was working as a teller at the drive-
in window at UPB on 3/23/04 when he saw four Black males in a mint-
colored Saturn car drive through one of the lanes, and without
stopping, continue onto the street. He was able to see the driver
and the man sitting in the back passenger seat behind him. Riera
described the Saturn driver [whom Jenkins later identified as being
Simpkins] as a heavyset, Black male, with dreadlocks, and testified
that he had focused on him because of his hair. (Jeffrey Jenkins,
who testified that he entered the bank and held a gun to Riera's
head and took money from the tellers' drawers, testified that
shortly before the robbery, Nathaniel [Simpkins], who was his
driver for the UPB robbery, had driven through a lane in front of
the UPB drive-through window. Jenkins saw that the teller was
looking out of the window at them. At trial, Jenkins identified
Simpkins in the courtroom, and testified that his appearance from
the day of the robbery had changed, because Simpkins, who had had
"long dreads" on the day of the UPB robbery, had cut them off.
Jenkins was shown a photograph of Simpkins, which was introduced as
Government Exhibit 2, and testified that it showed Simpkins as he
had appeared on the day of the bank robbery).

Riera also testified that before seeing the Saturn drive
through the lane, he had heard customers inside the bank talking
among themselves about a suspicious vehicle with four Black males
in front of the bank. It initially worried him, but he went back to
his seat at the drive-through window. It was then that he saw the
car pass by. He testified that, at that point, one of the other
employees started to write an E-mail message to security, but
within about one minute, Black males entered the bank, announced it
was a bank robbery, and told everyone to get down.

Riera further testified that once the Black males were inside the bank, one of them [Jenkins] put a gun to his head, opened the teller drawer, and started to put money in a bag. Jenkins then told him to help put money in the bag, and he complied. While doing so, Riera retrieved a dye pack from drawer and put it along with money into the bag. [He described it as a strapped bundle of $20 bills with a dye inside, which blows up outside of the bank, staining stolen currency so that it can be traced]. Riera then was instructed by Jenkins to follow him, and went to the other teller drawers and emptied them for Jenkins. Jenkins thereafter told Riera to get down on the ground, and after he did so, Riera was able to get into one of the teller stalls and press the silent alarm.

The teller supervisor, Jessica Alonso, testified that she was working as one of two lobby tellers when she heard another teller scream as two gunmen entered the bank. She testified that one jumped over the counter, that although she was on the ground she looked and could see his eyes, and saw the gun in his hand. She testified that that gunman asked "the other teller that was in the driving" for money. She believed that the gunmen were Black. She also testified that before the men entered the bank the other teller had been told by a customer that there was a suspicious vehicle outside with three Black men in it. Alonso testified that they went to the manager's office, and when she told him that, he instructed her to make a report to the security department. Alonso testified that she was aware that the car was teal colored, but that she had not actually seen it.

Jenkins testified that he was one of the two gunmen who entered the bank. [Irving was the other]. Jenkins testified that he held a gun to the teller's head, and  Jenkins also testified that, before the robbery, Simpkins was present in the light blue-colored four door car borrowed from Curtis Brown's mother, when he [Jenkins] loaded a gun and gave it to the other gunman [Irving], in Simpkins' presence, for him [Irving] to use in the UPB robbery.

Jenkins testified that Simpkins drove Mrs. Brown's vehicle as

a get away car, and after they left the bank and Nate [Simpkins] went back through the drive-through to the street, he was getting into the bag of money when there was a sudden impact as the dye pack exploded, burning him and some of the money, and spewing dye on him and in the back seat of the car. Simpkins was going to stop, but he [Jenkins] told him to roll down the windows, and to keep going. They proceeded to Browns' mother's [Mrs. Russell's] house, where they used her washing machine to wash some of the money, but it didn't come clean. When asked who was there at the time, Jenkins testified at trial that, in addition to him, there was Nathaniel [Simpkins], that "[t]here was Tinnell, my gunman, who was with me...," "Anthony, which we called him Little Leagues," and "Anthony brother, Jimmy." Jenkins testified that they all participated in the attempt to launder the money, but that they weren't too suc-cessful on the first day, using Mrs. Russell's washing machine, because it didn't come clean. Jenkins testified that they then went to the house of Curtis Brown's cousin, "Anthony, Little Leagues," where they continued their attempts to clean the money, first using Oxyclean, and then resorting to kerosine. Since it was getting late, they decided to go home and they all returned the next day, to try to finish cleaning the money with kerosine. Jenkins testified that everybody got some of the money from the robbery, including Nathaniel [Simpkins] who got about $5,000.00.

Jenkins, testified that he had committed about seven bank robberies, and that not including the UPB robbery, he had been convicted for three of them and was in a facility for federal prisoners. Jenkins testified that in July 2004 he was questioned by police and confessed his involvement in the UPB robbery, and that he had told them that Simpkins drove one of the cars used in the robbery. On direct examination, Jenkins also testified that he hoped to receive a reduction in a 47½ year sentence he had received for other bank robberies, in return for his cooperation with the government in regard to the UPB robbery. Jenkins was cross-examined by Simpkins's trial attorney about his desire to possibly avoid a minimum mandatory 25 year sentence, by providing substantial assis-tance. On re-direct the government elicited Jenkins' testimony that

in July 2004, at the time that he confessed to law enforcement officers, and implicated Simpkins in the UPB robbery as being his driver, he had not been charged by officers, he had no agreement with the government, and did not know for what bank robberies he might be charged.

Curtis Brown [who prior to his 9/22/05 testimony in Simpkins' trial had himself plead guilty two counts 2 and 3 in the UPB case on 9/13/05, and ultimately was sentenced on 12/21/05 (see Docket in Case 05-20318-Cr-Lenard], testified that in organizing a team for the UPB robbery he needed two gunmen, and two get away cars. One car would carry the gunmen and cash as they fled from bank, and the second car would serve to protect the first one, by blocking traffic, if necessary. Brown had checked out the UPB lobby and saw no security guard, and no cages or glass windows that would keep him from climbing over the teller counter to get the money. Brown testified that he collaborated with Jeff Jenkins, and decided they needed a minimum of five people. Brown testified that he could not drive because he had no license. Brown, like Jenkins, testified that Simpkins refused Brown's request/proposition that he act as a gunman, but agreed to be a driver. Brown's testimony indicates that at the time of the get away, the main get away driver, Simpkins, had the two gunmen, Jenkins and Irving, in the vehicle he was driving [Russell's Saturn].  The other vehicle [a Dodge truck which belonged to Jimmy O'Neal], had Brown in the back seat, Brown's cousin Jimmy [O'Neal] as the driver, and Brown's other cousin Anthony [Rose] in the front passenger seat.

Brown testified that during the robbery he stayed in the truck across the street. A police car was in the vicinity, and Brown phoned Jeff Jenkins in the Saturn to warn them, and ask if they wanted to hold off, or pick another bank. Jenkins said, No, that they would circle around. When Brown called on his cell phone again, he spoke with Simpkins, who said that the others had just gone into the bank. Brown told Simpkins to stay in contact by phone, so that they could be ready to leave right behind them. Shortly thereafter Simpkins told Brown that the gunmen were coming

out of the bank. Brown testified that the Saturn pulled out from the front of the bank, and that he was behind, in the truck, with approximately four cars in between. Brown testified that as he looked forward, and up in the air, he could see a "red cloud." When asked if it appeared to be coming from the Saturn, Brown responded, "No. I didn't see it coming from the Saturn. I just seen a red cloud up in the trees. It looked strange to me." Brown communicated with the Saturn by phone, and Jeff Jenkins told him that there had been a dye pack in the money bag. Brown called back, and someone said that Jenkins had gotten sick to his stomach. Brown suggested pulling over if they couldn't see, but they said, No, that they would keep going. Brown testified that all of them [Brown himself, Nathaniel Simpkins, Tinnell Irving, Jeff Jenkins, Anthony Rose, and Jimmy O'Neal] then went to his mother's house. Shortly after arriving there, however, Jimmy left, to go pick up his daughter, or do some personal business. Brown testified that he and the others used his mother's washing machine to try to launder the currency, but he/they did not show her the money. When the money didn't come clean, they put it in a bag, and went into Brown's sister's room to smoke some drugs.  Brown testified that they later went to Anthony Rose's house and put the money in a dryer.

Brown's mother, Mrs. Russell, testified that, on the day in question, she saw that her son, Curtis Brown, her nephew, Anthony Rose, Nathaniel Simpkins, and Jeffrey Jenkins, had come to her house. One of them had a bag in his hand when they arrived. She testified that at one point she went outside because a neighbor had called her; and then she walked back into her house because she smelled the odor of dope being smoked in her daughter's room, and she started fussing with the men. Then she went back outside because her neighbor called and said there were people outside in the back yard, and when Mrs. Russell went there she could see stuff that looked like red dye running from her washing machine, which was located in back of the house. She testified that she left, and went to church, and that when she returned, some of the men were in the back room smoking. Mrs. Russell then went to the kitchen, to put something in the garbage, and saw that there was a bag in her

garbage can, with something red on it.  When she asked "What is this in my garbage can?", Nathaniel [Simpkins] said, "Oh, my bag," and he took it and walked out the door with it.  Mrs. Russell also testified that, three days later, when her daughter brought it to her attention, she discovered that the front seat of her car was torn, and that "[i]n the back right-hand side of the back seat, there was a lot of red stuff all over the seat." Russell testified that when she asked her son Curtis Brown about it, he told her that "Jeffrey [Jenkins] had some paints back there," and that "they was gonna get it clean."

On cross-examination, Brown was questioned about the agreement pursuant to which he was pleading guilty to two counts of the indictment, with the government's agreement to dismiss the other count, and questioned him about his motivation to lie. Brown testified that when he had first spoken to the police he did not tell them he was involved in the robbery, but he maintained that he had not lied to them. He testified that he simply hadn't told them everything. Brown testified that he did not recall telling the police that he and his cousin Anthony were across the street in a truck, but were unaware that a robbery was occurring. Counsel then presented Brown with a copy of a report of his police interview, and Brown responded that the report consisted of the agents' impressions of what he had said, rather than his statements themselves, and said that he had not lied. After Brown's testimony, at the close of the government's case, Simpkins' attorney stated that in order to impeach Brown's testimony, he intended to call an agent who had been present during Brown's interview, whom he [counsel] expected would testify that Brown had made false statements to police. The government argued, in response to counsel's request, that the written report referenced during Brown's cross-examination indicated that Brown had admitted involvement with the bank robbery. The government argued that the agent's testimony would be improper impeachment, since Simpkins through counsel had not show that Brown's statements were inconsistent. The government requested clarification on which statements Simpkins intended to impeach Brown. The defense replied that it was its impression that

14

both Rose and his cousin, Brown, had given police the same false
story when they first met with officers, i.e., that they had not
been involved in the robbery. [Defense Counsel argued that Rose,
Brown's cousin, said to the police, "Myself and Mr. Brown weren't
involved in any Bank Robbery. We just happened to be in this truck
and we just happened to be at that mall and we saw Jeff Jenkins
come running out of the bank and jump in the car. The car drove off
and then this red plume of smoke came out of it." See ROA, Cr-
DE#126, T/292-93]. Defense counsel argued that the police report,
when read in conjunction with Rose's statement to police that he
and Brown were not involved in the robbery, showed that Brown had
initially denied involvement in the UPB robbery. Defense counsel
further argued that such a reading conflicted with Brown's trial
testimony that he had not lied to law enforcement.  The pertinent
portion of the police report, which was read into the trial record
by Defense Counsel, was as follows:

> Rose came by Brown's house in an old two-toned Dodge truck,
> possibly a Prospect, driven by someone unknown to Brown.
>
> Brown rode in the back of the truck and Rose was seated in the
> front passenger seat. The three individuals were following
> Jeff Jenkins, who is a passenger in Judy Russell's car driven
> by Nathaniel Simpkins.
>
> Brown advised that Jenkins had lived in Hialeah at one time
> and was familiar with the area. Brown recalled seeing a pawn
> shop and a Latin American Cafeteria in the same area as the
> Union Planters Bank.
>
> Brown recalled seeing the Saturn exiting the bank parking lot
> with a red cloud billowing out of the Saturn.
>
> Jenkins called Brown on the cellphone and told Brown that they
> needed a washing machine.
>
> Brown asked Jenkins why, at which point Jenkins suggested that
> they go to Brown's mother's house.

(ROA; Cr-DE#126, T/293-294).  The Court, upon it's examination of
the report, found that it contained no indication that Brown had
denied involvement with the robbery. In so ruling, the Court
stated:

I don't see anywhere in the statement where Brown initially stated to the officers that he was not involved in the robbery and he was seated at the mall.

In the second paragraph, he says, "Jeff Jenkins woke Brown up by banging on his front door in his bedroom window.  Jenkins told Brown that he wanted to, quote, 'do dirty,' which Brown took to mean that Jenkins wanted to do a robbery, and that Brown had to get someone to drive," which is what Brown testified to.  That's what he told the detectives, that they had agreed to rob a bank.

The only area that he seems to have contradicted what was in the statement is that "Brown recalled seeing the Saturn exiting the bank parking lot with a red cloud billowing out of the Saturn," and he testified that he actually saw the red cloud in the sky and not coming out of the car.  Is that the area you wanted to ask him about?

(ROA; Cr-DE#126, T/296-297).  Counsel responded, "No," that the discrepancy about the red cloud was not what he wanted to ask about, and said that "I'm reading the report differently than the Court is and the Government is."  The Court then found that there was no basis for the defense to call the FBI Agent for impeachment purposes. The Court determined that the defense intended to call no other witness, and defense counsel, confirming that the government had rested its case, moved for a judgment of acquittal based on the evidence. The government argued that the jury had heard that a bank robbery was committed on the date and place charged in the indictment, that from multiple witnesses with no motive to lie, they heard that Nathaniel Simpkins was involved in the robbery. Two witnesses had identified him as a get away driver, and a third identified him as assisting after the fact in laundering the money. The government further argued that unless the defense was arguing that the witnesses should be stricken as incredible as a matter of law, there was sufficient evidence to go to the jury. Defense counsel had nothing further, and the trial court ruled that taking the evidence in the light most favorable to the government, a reasonable jury could find the defendant guilty of the crimes charged in the indictment, and that they had presented evidence as to all the elements of the counts in the indictment.  The Court denied the motion for judgment of acquittal. The Court admonished

16

the jury that Simpkins was only being tried for the offenses that were charged in the indictment. The jury found Simpkins guilty on all three counts; the district Court sentenced him to a 114 month term of imprisonment; and the aforementioned appeal followed.

## V.   Discussion

### A.  Ineffective Assistance of Counsel

#### 1. Applicable Law

In order for the movant to prevail on a claim of ineffective assistance of counsel, he must establish that 1) his counsel's representation fell below an objective standard of reasonableness; and 2) but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668 (1984). The standard is the same for claims of ineffective assistance on appeal. Matire v. Wainwright, 811 F.2d 1430, 1435 (11 Cir. 1987). A court may decline to reach the performance prong of the standard if it is convinced that the prejudice prong cannot be satisfied. Id. at 697; Waters v. Thomas, 46 F.3d 1506, 1510 (11 Cir. 1995).

Review of counsel's conduct is to be highly deferential. Spaziano v. Singletary, 36 F.3d 1028, 1039 (11 Cir. 1994), and second-guessing of an attorney's performance is not permitted. White v. Singletary, 972 F.2d 1218, 1220 (11 Cir.1992)("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."); Atkins v. Singletary, 965 F.2d 952, 958 (11 Cir.1992). Because a "wide range" of performance is constitutionally acceptable, "the cases in which habeas petitioners can properly prevail on the ground of ineffec-tive assistance of counsel are few and far between." Rogers v. Zant, 13 F.2d 384, 386 (11 Cir. 1994).  To establish deficient per-formance the movant must point to "particular and identified acts or omissions of counsel" that were "'outside the wide range of pro-fessionally competent assistance.'" Chandler v. United States, 218 F.3d 1305, 1314 (11 Cir. 2000) (quoting Burger v. Kemp, 483 U.S. 776, 795 (1987). See Waters v. Thomas, 46 F.3d 1506, 1512 (11 Cir. 1995) ("the test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers have done.

We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial").

Bare and conclusory allegations of ineffective assistance of counsel which contradict the existing record and are unsupported by affidavits or other indicia of reliability, are insufficient to require a hearing or further consideration.  See United States v. Robinson, 64 F.3d 403, 405 (8 Cir. 1995), Ferguson v. United States, 699 F.2d 1071 (11 Cir. 1983), United States v. Ammirato, 670 F.2d 552 (5 Cir. 1982); United States v. Sanderson, 595 F.2d 1021 (5 Cir. 1979).

## 2.  **Analysis**

Simpkins cannot prevail on his first three arguments: **Ground 1(a)**, that his trial attorney should have challenged the indictment because his July 9, 2004 statements/confession to police were suppressed; **Ground 1(b)**, that his attorney should have moved to dismiss the indictment, because in Simpkins contends that there was no evidence to support the indictment, after the trial court granted his motion to suppress his statements to the police; and **Ground 1©**, that counsel should have filed a motion arguing that all other evidence in the case was fruit of the poisonous tree, where Agent Hughes allegedly misled police by telling them that he had probable cause for Simpkins' arrest.

Apart from Simpkins' own statements which were suppressed, there was ample evidence against him, proffered through testimony by two bank tellers [Riera and Alonso], by two co-conspirators [Jenkins and Brown], and by Brown's mother [Mrs. Russell].

Defense counsel, at trial, vigorously cross-examined his client Simpkins' co-conspirators Jenkins and Brown, in an attempt to show that they were motivated to lie and benefit from testifying against Simpkins. Counsel also strived to impeach witness credibility by arguing that Brown had lied to law enforcement during an initial interview that was memorialized in written notes [allegedly denying therein that he was involved in the UPB bank robbery, and

stating that he merely happened to be present in the truck nearby when Jenkins and others robbed the bank it], and that Brown then at trial gave inconsistent testimony stating that he and others including Simpkins had planned and participated in the UPB robbery. The court, at trial, and the Eleventh Circuit, on appeal, explored movant Simpkins' contention that Brown's statement to police and Brown's testimony at trial were inconsistent, and found no material inconsistencies that would serve to impeach Brown's credibility on that ground, after comparison of the officer's notations from Brown's statement with Brown's testimony at trial. [There was only a small discrepancy, regarding whether Brown, in the truck following behind the Saturn driven by Simpkins, simply saw a red cloud up in the air/sky, or whether he actually saw the red coming out of the car]. For that reason, the trial court denied defense counsel's vigorous attempt to call the FBI agent as an impeachment witness at trial.

The witnesses' evidence against Simpkins established that he was involved at the planning stages, and negotiated his role as a get away driver rather than that of a gunman. It showed that Simpkins was present and participated in the robbery, by driving Mrs. Russell's car, first to check things out by circling the bank and its surroundings on the day of the robbery, before the gunmen entered the bank, then by waiting in the driver's seat of the get away car while Jenkins and another co-conspirator [Irving] entered and robbed the bank, and finally by driving the get away vehicle [Mrs. Russell's car] with the two gunmen [Jenkins and Irving] in it, in which the dye pack exploded, causing dye to escape from the car into the air. The evidence showed that Simpkins was fully aware of the use of firearms during the robbery. He had negotiated not being one of the gun carriers; Jenkins, in Simpkins' presence, loaded a hand gun and gave it to Irving before Jenkins and Irving entered the bank, and then fled from the bank in the vehicle driven by Simpkins. Other evidence established that the robbery was actually committed with the use of a firearm, where both Jenkins and Irving entered the bank with guns, and Jenkins had held a gun to the teller Riera's head. Finally, the evidence established that

19

after the get away, Simpkins, with other co-conspirators, went to
Mrs. Russell's house, to clean dye from the money using her washing
machine. Mrs. Russell saw red liquid flowing from the washing
machine discharge behind her house, and saw red stains in the back
seat of her vehicle which had been loaned to her son. Finally,
there was testimony from Mrs. Russell, a civilian, who had no
motivation to lie, stating that on the day that her son and others
came to the house and she saw red coming out of the washing
machine, she also saw a red stained bag in her garbage can; and
when she asked what it was, the movant Simpkins came forward, told
her that the bag was his, removed it from the garbage, and walked
away with it in his hand.

Simpkins' arguments in grounds 1(a), (b) and © fail.  They
presume, in conclusory fashion, without any support, that once his
statements to police were suppressed, there was no probable cause
for the government to believe that he had committed an offense or
offenses charged in the indictment, and that all other evidence in
the case was tainted. It is apparent that not only was the evidence
against Simpkins sufficient to indict and bind him over for trial,
but that the evidence adduced at trial was overwhelming. The
Indictment (Cr-DE#1) was not lodged against Simpkins until April
15, 2005, some eight months after he was questioned by police on
April 9, 2004. When the June 15, 2005 Suppression Motion was
granted on September 19, 2005, only statements he made on July 9,
2004 were suppressed. There is no showing that all other evidence
in the case flowed from Simpkins' July 9, 2004 statements to
police, which ultimately were suppressed. Finally, notwithstanding
Simpkins' contention, and apparent belief to the contrary, there is
also no evidence that FBI Agent Hughes, who was present on the
night of movant Simpkins' questioning, lied to local police by
allegedly falsely saying that based on what was known at the time
there was probable cause to arrest. Under these circumstances, no
deficient performance or prejudice has been established arising
from counsel's alleged failure to challenge the indictment or his
alleged failure to challenge all evidence in the case as fruit of
the poisonous tree.

20

Simpkins, **in Ground 1(d)**, argues that counsel failed to pursue an avenue of defense, which he contends should have been apparent from discovery provided by the government. This was that Lester Ponder, a friend of Curtis Brown, had gone to jail with Brown as the result of a drug sting, before the UPB robbery, and that Ponder who is Black and 6'1" tall, weighed 210 lbs and had "very long dreads." Simpkins contends that if counsel had introduced this as evidence at his trial, a jury might have reasoned that he [Simpkins] was not involved in the UPB robbery. Here, apart from the fact that he offers nothing more to suggest that Ponder was or could have been involved in the UPB robbery, instead of him, the evidence of Simpkins' involvement in the UPB robbery was overwhelming. Not only did Simpkins' co-defendants identify him as a co-conspirator and place him at the scene while the robbery was taking place, but there was independent testimony from Mrs. Russell that Simpkins was present with the others at her house when the washing machine discharge ran red, and that Simpkins had claimed ownership of a red-stained bag when she saw it and asked what it was.

It is noted that, as a supplemental exhibit (Ex.C, at Cv-DE#17 pp.38-40), Simpkins offers a Miami-Dade Circuit Court Order dated May 7, 2004, requiring return of $1,970.00 in cash, and offers a related 3/31/04 arrest report from Police Case #175395, to show that Ponder and Brown were co-defendants in criminal case F04-10116. The arrest report states that officers on narcotics surveillance observed two Black males, A1, the driver, and A2, the passenger, stop and make a money for drugs transaction. The officers made a traffic stop, and as they approached, A1 was observed passing a plastic bag to A2 which was placed on the floor board by A2. The police report indicates that "A1" had $1970, and "A2" possessed $310; and although the report indicates that some of the money was "red-dye pack marked," Simpkins' Exhibit, while indicating an association between Brown and Ponder, does nothing to prove any involvement by Ponder in the UPB robbery.

Under the circumstances, it apparent that counsel's failure to

21

attempt to introduce evidence of a connection between Brown and
Ponder, in an effort to suggest that Ponder and not Simpkins was
involved in the UPB robbery, was not deficient performance under
Strickland. Even if, *assuming arguendo*, that counsel had attempted
to introduce evidence that Brown and Ponder knew each other, and
were arrested in a drug case together approximately one week after
the UPB robbery, it is not certain that the evidence would have
been ruled admissible. Moreover, there is no showing of prejudice
as a result of counsel's alleged failure, because the evidence of
Simpkins' personal involvement in the UPB robbery was overwhelming,
including the testimony of co-conspirators which was found to be
credible by the jury, and the testimony of Mr. Russell, who
testified that Simpkins was present at her house when the men were
using her washing machine, and that on that day he [Simpkins]
claimed ownership of a red-stained bag that was in her trash.

In **Grounds 1(e) and 1(f)**, the essence of Simpkins' claims is
that counsel did an ineffective job of impeaching his co-conspir-
ator, Curtis Brown, who testified against him for the government.

As previously noted, counsel sought to pursue an avenue of
impeachment of Brown's credibility, by attempting to show that
inconsistencies existed between a statement given to law enforce-
ment by Brown as memorialized in notes on an FBI form, and Brown's
trial testimony. Although the Court determined that there was no
material inconsistency between the challenged statement reflected
in the FBI form, and Brown's testimony in open court before the
jury, and ruled that the defense would therefore not be allowed to
call the FBI agent as an impeachment witness, the record reflects
that counsel made a vigorous attempt to pursue this as one avenue
of defense. In addition, the record shows that counsel, faced with
what was overwhelming evidence which included damning testimony
from Brown and Jenkins, made a zealous attempt to impeach the co-
conspirators' credibility by eliciting testimony from them that
they stood to benefit, or hoped to benefit from their testimony
against Simpkins, as a result of cooperation with the government,
*inter alia*, Jenkins having negotiated immunity from prosecution on

22

charges stemming from the UPB robbery, and Brown having entered a plea pursuant to which Count 1 (conspiracy) was dismissed, and he plead guilty to counts 2 and 3 (the robbery and firearm charges, respectively). Counsel also got Brown to admit on cross examination that when he first met with police he had told them partial truths, for example, by omitting from what he told them that he had [in counsel's words] "done a bank robbery with a bunch of guys," and by covering for his cousin, by not telling the police that he was involved. In addition, counsel presented evidence that Brown lacked credibility because of his prior felony convictions.

Here, it is apparent, given the deference with which conduct of counsel is viewed by courts when considering claims of ineffective assistance, that it cannot be said that the conduct of movant Simpkins' trial defense attorney fell outside the "wide range" of performance which is professionally competent and constitutionally acceptable. See Rogers v. Zant, supra, 13 F.2d at 386; Chandler v. United States, supra, 218 F.3d at 1314. Examination of Simpkins' supplemental Exhibits A, B, and F, as described in footnote 1 of this Report, supra, reveals nothing to change that conclusion.

**Ground 1(g)** in movant Simpkins' memorandum consists of a single sentence: "Counsel refused to allow the defendant to testify." (See Memorandum, Cv-DE#2 at p.2). As such, Simpkins' claim of ineffective assistance at Ground 1(g) is a bare bones allegation, with no supporting allegations, including the lack of any indication as to what he would have said at trial, had he testified.[3]

Of course, a criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial. Rock v. Arkansas, 483 U.S. 44, 49-52 (1987); United States v. Teague, 953 F.2d 1525, 1532 (11 Cir. 1992)(en banc). This right is personal to the defendant, and cannot be waived by the trial court or defense

---

[3]    It is noted that with its Response (Cv-DE#9) the government submitted an Affidavit by Simpkins' trial attorney, Michael D. Spivack, Esquire. That affidavit, however, has not been considered in conjunction with review of movant Simpkins' claim, and preparation of this Report.

counsel. Teague, supra; Brown v. Artuz, 124 F.3d 73, 77-78 (2 Cir. 1997). The proper vehicle for an argument that a defendant's right to testify was violated by his trial counsel is a claim of ineffective assistance of counsel, which requires analysis under Strickland v. Washington, 466 U.S. 668 (1984). Gallego v. United States,174 F.3d 1196 (11 Cir. 1999)(citing Teague, 953 F.2d at 1534); Brown, 124 F.3d at 79-80; Sexton v. French, 163 F.3d 874, 882 (4 Cir.), cert. den'd, 120 S.Ct. 139 (1999). United States v. Tavares, 100 F.3d 995, 998 (D.C. Cir.1996).

In Teague, supra, the Eleventh Circuit held that an attorney who refused to accept the defendant's decision to testify, or failed to inform him of his absolute right to testify "would have neglected the vital professional responsibility of ensuring that the defendant's right to testify is protected," and counsel's action would not have fallen "within the range of competence demanded of attorneys in criminal cases." 953 F.2d at 1534 (quoting Strickland v. Washington, supra). The Teague court, having the benefit of testimony from an evidentiary hearing on the defendant's motion for a new trial, found that counsel's performance had not been deficient, and therefore did not address the prejudice prong of the Strickland analysis. 953 F.2d at 1535.

Not all assertions of ineffective assistance of counsel with regard to the right to testify or not testify, however, warrant an evidentiary hearing. Underwood v. Clark, 939 F.2d 473 at 476 (7 Cir. 1991)(barebones assertion by a defendant is insufficient to require a hearing on a claim that the right to testify was denied, greater particularity and some substantiation such as an affidavit from the lawyer who allegedly forbade his client to testify are necessary to give the claim sufficient credibility to warrant a further investment of judicial resources); Siciliano v. Vose, 834 F.2d 29 (1 Cir.1987)(defendant's conclusory allegation that his attorney refused to allow him to testify in his own behalf was insufficient to entitle him to hearing on issue of whether his right to testify was violated); Passos-Paterrnina v. United States, 12 F. Supp. 231, 239-40 (D. Puerto Rico 1998).

The Fourth Circuit has held that a hearing was not necessary where the defendant suffered no prejudice under <u>Strickland</u>, <u>supra</u>, because "his testimony at trial only helped his case...." <u>Sexton v. French</u>, 163 F.3d 874, 883 (4 Cir. 1998), <u>cert. denied</u>, 120 S.Ct. 139 (1999). As stated, the Eleventh Circuit has not determined whether a conclusory allegation is sufficient to warrant further inquiry, such as the grant of a hearing.[4] <u>See</u>, <u>e.g.</u> <u>Brown</u>, 124 F3.d at 80. However, it is clear that a defendant must prove prejudice in order to be entitled to relief on such a claim. <u>See</u> <u>Teague</u>, <u>supra</u>.

As noted, <u>supra</u>, in order to satisfy the prejudice prong, the movant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland</u>, <u>supra</u>, at 394. In other words, the movant must prove "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687; <u>see also</u>, <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369 (1993), <u>citing</u>, <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986)("The essence of an ineffective assistance of counsel claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."). In <u>Fretwell</u>, the Supreme Court also concluded that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." <u>Fretwell</u>, <u>supra</u> at 369, <u>citing</u>, <u>United States v. Cronic</u>, 466 U.S. 648, 653 (1984). The touchstone of an ineffective-assistance claim is the fairness of the adversary proceeding, and "in judging prejudice and the likelihood of a different outcome, '[a] defendant has no entitlement to the luck of

---

[4]    In <u>Gallego v. United States</u>, 174 F.3d (11 Cir. 1999) the Court rejects a "per se credit counsel in case of counsel rule," with regard to credibility findings in evidentiary hearings, but does not address the issue of when a hearing is actually required.

a lawless decisionmaker.'" Fretwell, supra at 370, citing, Strickland, supra at 695.

For purposes of the pro se §2255 motion and this Report it will be presumed from the context of Simpkins' other claims (attacking credibility of others who implicated him in the UPB robbery; and arguing that counsel should have told the jury that Curtis Brown had a friend, Lester Ponder, a Black male of large build, with long dreadlocks, because doing so might have suggested to the jurors that he [Simpkins], was not guilty of the offenses charged) that if Simpkins had testified, as he claims that he was prevented from doing, he would have asserted his innocence of the offenses charged. Here, even if movant Simpkins had testified, and further assuming, arguendo, counsel was deficient for failing to allow the movant to exercise his constitutional right to testify on his own behalf, the movant would still be entitled to no relief on this claim because he cannot satisfy the prejudice prong of Strickland. As discussed, supra, at length, the evidence at trial was overwhelming, and amply supported his convictions. There is nothing to suggest that Lester Ponder, and not Simpkins, was involved in the robbery. Not only did Simpkins' co-conspirators implicate him in both the planning and execution stages of the bank robbery, but Mrs. Russell testified that Simpkins was at her house when the red water was coming from her washing machine, and that he claimed ownership of the red-stained bag that she found in her garbage. Although movant's Ex.B (at DE#17) suggests that Ponder and Brown were together in a vehicle which was stopped by police on 3/31/04, some 8 days after the UPB robbery, and although $310 which was inside the car was stained by red dye, there is nothing to establish that that currency, if it indeed came from the UPB robbery, was not attributable to Brown, and not Ponder. Moreover, there is no evidence to place Ponder in either vehicle used in the UPB robbery, at the bank itself, or at the Russell home after the robbery on 3/32/04. Thus, in light of the evidence against movant Simpkins, it is not likely that the result of the trial would have been different had Simpkins testified. Even if Simpkins had testified and made a blanket assertion of innocence, or attempted

26

to negate his involvement in the offenses, it does not appear that
there is a reasonable probability that his testimony would have
resulted in an acquittal.

The last claim of ineffective assistance, **Ground 1(h)**, also
consists of a single sentence, with no additional supporting facts
or allegations. The claim reads in its entirety, as follows:
"Counsel failed to introduce evidence that the Government witness
Curtis Brown committed perjury." (<u>See</u> Memorandum, Cv-DE#2, p.2).

This is essentially a restatement, in another form, of
Simpkins' other grounds attacking counsel's competence for alleged
failure to impeach Brown.  As discussed at length, above, the rec-
ord indicates that counsel took more than one avenue, in an attempt
to undermine Brown's credibility, both by attempting to show that
he made custodial statements to police that were allegedly incon-
sistent with his trial testimony, and by attempting to show through
cross-examination of Brown that he was motivated to lie, by virtue
of benefits he would derive from cooperating with the government
and testifying against Simpkins. This claim does not add anything
more, and does not suffice to establish that counsel's efforts on
Simpkins' behalf were constitutionally deficient.

In sum, with regard to the alleged deficiencies which he
attributes to counsel, the movant Simpkins has not shown that the
result of the trial would have been affected had counsel proceeded
differently. In other words, no deficient performance or prejudice
pursuant to <u>Strickland</u> has been established arising from any of the
ineffective assistance claims raised in this collateral proceedings
as grounds 1(a) through 1(g).

### B.  <u>Substantive Claims, Raised as Grounds 2, 3, and 4</u>

In its Response (Cv-DE#9) the government argued that the
substantive claims raised as grounds 2, 3, and 4, go to the merits
of the case, and do not involve ineffectiveness of counsel. The
government argued that, as such, they are not allegations appropri-
ate to a §2255 motion, and are procedurally barred. Accordingly,

the claims were not addressed in the government's Response. As
noted <u>supra</u>, the movant Simpkins filed a "Reply"/traverse to the
government's Response (Cv-DE#14).

The record, including Simpkins' Reply (Cv-DE#14), indicates
the following. Simpkins' attorney at trial was Assistant Public
Defender Michael D. Spivack, Esquire. Simpkins' Notice of Appeal
(Cr-DE#104) was signed by Mr. Spivack. On February 8, 2006, Mr.
Spivack moved for leave to withdraw (Cr-DE#132), stating that he
had ordered copies of the trial transcript, and that Mr. Simpkins
had sent a January 24, 2006 letter requesting that he withdraw from
further representation of him on appeal. The Court denied that
motion (Order, Cr-DE#136). Upon a Motion for Reconsideration (Cr-
DE#137-1) and renewed motion to withdraw (Cr-DE#137-2) providing
further information [i.e., that Simpkins' letter stated appreci-
ation for counsel's efforts, but requested that counsel remove
himself "so I can get a second opinion on certain issues that might
have been mistakenly overlooked"] the Court granted both motions
and allowed counsel to withdraw. (Order, Cr-DE#138). Marisa Tinkler
Mendez, Esquire, was appointed to represent Simpkins in February
2006 (Cv-DE#14, p.8). Attorney Mendez, on August 20, 2007, filed a
letter with the Clerk of Court (Cr-DE#155), stating that she had
been elected to a position as a Dade County District Court Judge,
and asking the Clerk to disseminate that information in the Court
records, since she would soon become an inactive member of the bar
and cease the practice of law. The next day, August 21, 2007, the
Eleventh Circuit's Opinion affirming Simpkins' judgment in his
criminal case was filed with the Clerk. (The appellate opinion had
been entered on July 18, 2007, and was issued as the Court's
Mandate on August 16, 2007).

In his Reply (CV-DE#14), Simpkins indicates that in the
interim [between February 2006 when Attorney Mendez was appointed,
and August 2007 when Ms. Mendez's letter and the Appellate Court's
Mandate affirming Simpkins' judgment were docketed] he had received
notice in February 2007 from the Court of Appeals informing him
that J. Rafael Rodriguez was appointed to represent him. (Cv-DE#14,

p.9). Simpkins states that he wrote to Attorney Rodriguez, raising issues presented here as Grounds 2-4, and that in the weeks that followed Mr. Rodriguez responded with a letter, providing Simpkins a copy of a supplemental brief. Simpkins states that the government then filed a response to the Supplemental Brief, and that he wrote to Mr. Rodriguez stating that since "the appellant always gets to file the last brief according to the rules," he was "demanding that he raise these issues in the last brief." Simpkins argues that Attorney Rodriguez responded in a letter, which Simpkins para-phrases as stating that "the issues that he [Simpkins] had previously explained" were more appropriate for a §2255 motion. Simpkins includes with his Reply/traverse a copy of Mr. Rodriguez's letter, dated June 11, 2007, which in pertinent part reads, as follows:

> I was glad to hear that you received the copy of the Government's response brief. You have requested that certain matters be raised in response. Please note that should the appellate court grant our request for oral argument, I will address all the issues raised in the initial brief and the supplemental brief filed in the case. As I have previously explained to you, many or the issues you raise in your recent correspondence are more appropriate for Section 2255 proceedings...

(Cv-DE#14, p.11). As such, the substantive claims which are raised as Grounds 2, 3, and 4, will be addressed herein, because Simpkins' Reply/traverse, liberally construed, in essence asserts that Simpkins' replacement appellate counsel was ineffective for not raising the claims on direct appeal. As discussed, <u>supra</u>, in Section "V.A.1." of this Report, the reasonableness standard which applies to representation by trial counsel, as enunciated in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), applies to claims of ineffective assistance on appeal. <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11 Cir. 1987).

In **Ground 2**, movant Simpkins argues that he was subjected to "malicious prosecution." Simpkins claims that during the course of his detention on July 9, 2004 when he gave his statements to law enforcement officers which later were suppressed, FBI Agent Hughes

lied to local police by misleading them to believe that he [Hughes] had probable cause to arrest him. Simpkins further claims that he was singled out, and that Agent Hughes had him prosecuted without probable cause "just because he wanted to convict somebody."

Simpkins, in support of this claim makes a convoluted argument in his Memorandum [Cv-DE#2] about the circumstances of his lengthy detention on July 9, 2004, which involved interaction with several officers, including an FBI Agent, and led to lack of clarity as to whether Simpkins was at the police station voluntarily for questioning and free to go, or whether he was under arrest and was not free to leave at the time that he interacted with them.[5] As discussed, *supra*, the circumstances of Simpkins's July 9, 2004 detention and interrogation, were considered at length in conjunction with his motion to suppress statements, which was granted upon consideration of a Report and Recommendation and *de novo* review of the record, after an August 15, 2005 evidentiary hearing at which testimony was given by Simpkins and law enforcement officers involved.

This "Malicious Prosecution" claim could have been, but was not raised on direct appeal. Although a claim of ineffective assistance of counsel may constitute cause for failure to previously raise this issue, see United States v. Breckenridge, 93 F.3d 132 (4 Cir. 1996), attorney error does not constitute cause for a procedural default unless it rises to the level of ineffective assistance of counsel under the test enunciated in Strickland v. Washington, supra. See Murray v. Carrier, 477 U.S. 478, 488 (1986).

---

[5]      Simpkins argues in his Memorandum supporting his §2255 motion (Cv-DE#2, pp.8-10) that the government in its response to his motion to suppress stated that Officer Starkey told him he was "free to leave." Simpkins states that Starkey was present with Agent Hughes when Hughes told him that "he was not leaving until he provided something...". Simpkins argues that Starkey did not testify [at the suppression hearing] that Hughes made that statement. Simpkins further argues that he "is simply pointing out why Starkey chose to tell the truth." Simpkins further argues that testimony given by Detective Garcia at the suppression hearing is "critical" because "the government boldly tried to get him to lie." Simpkins contends that this is demonstrated by Garcia's statement to the court [at the suppression hearing] that Simpkins was under arrest and not there [at the police station] voluntarily, because Starkey told him that. Simpkins finally argues that "[t]his just goes to show how agent Hughes had the defendant prosecuted without probable cause just because he wanted to convict somebody."

While Simpkins' statements given on 7/9/04 to police were suppressed on 9/19/05, it does not follow, and Simpkins has not demonstrated, that there was not, apart from his statements to police, independent evidence which provided probable cause to charge him via the Indictment returned on April 15, 2005, some 9 months after the July 2004 police interrogation, and 5 months before Simpkins' July 2004 statements were suppressed on the eve of trial.

Moreover, the decision whether to prosecute for an offense is vested solely in the discretion of the government, Wayte v. United States, 470 U.S. 598 (1985), and that decision did not rest with the state police officers or FBI Agent Hughes who were present and interacted with Simpkins and/or questioned him on July 9, 2004. The Indictment [Cr-DE#1] was signed by the U.S. Attorney and his Assistant, and signed and returned by the foreperson of the Grand Jury as a true bill.

Because this claim of Malicious Prosecution cannot prevail on the merits, appellate counsel cannot be said to have been ineffective for failing to pursue this non-meritorious claim on direct appeal.

Simpkins' **Ground 3,** if considered [due to his assertion that Counsel over his objections failed to raise the claim on appeal], also fails.

Jenkins argues in Ground 3 that the government had announced that testimony by both Jenkins and Brown would be offered regarding prior acts, which it contended were inextricably intertwined with the offenses charged in relation to the UPB robbery. [In support, Jenkins offers (at Cv-DE#17 Ex.D) excerpts from his trial transcript, which were already of record (see ROA, Cr-DE#125, T/134-37; and Cr-DE#126, T/183-222)]. Jenkins appears to contend in Ground 3, that when ultimately the government "found out" that only Brown would testify as to the prior acts, and that Jenkins would not, this raised an obligation on the part of the government to "consider that turn of events as impeachment evidence." Simpkins

reasons that the government did not question Jenkins about the prior acts, and that their failure to do so serves to "damage the credibility of Curtis Brown." Jenkins' direct examination (T/185-205) reflects that he was asked about prior bank robberies in which he was involved. It also reflects that when he was asked if he previously knew Simpkins, Jenkins testified that he had known him causally. There was no inquiry of Jenkins or testimony by him stating knowledge on his part that Simpkins had previously committed a bank robbery.

As discussed in the Eleventh Circuit's Opinion, the government gave Simpkins notice before trial, pursuant to F.R.E. 404(b), of its intent to introduce evidence that on March 3, 2004, just 20 days before the UPB robbery, Simpkins had participated in robbery of another bank. Simpkins sought its exclusion, arguing failure of the government to identify its reasons for offering the evidence and its relevancy. The government responded that the close proximity in time of the two robberies was probative of identity, knowledge and absence of mistake. The Court denied the motion to suppress the proposed 404(b) evidence, without prejudice, noting that its relevancy would depend on the theory of defense presented at trial. Then, at trial, Simpkins objected to introduction of testimony about the 3/3/04 bank robbery, and the government argued that it intended to offer testimony by Brown stating that in the UPB robbery Simpkins agreed to be a driver, but did not want to be a gunman, because in the earlier robbery he had been a gunman and felt that the small amount he was paid did not justify the danger he would face if he agreed to be a gunman in the UPB robbery. This, the government argued, explained the relationships of the parties, and therefore was not extrinsic evidence subject to exclusion under Rule 404(b). The government prevailed on this argument, and the Court of Appeals affirmed on the merits, on the claim raised as Simpkins' first issue on direct appeal. [That testimony, which the trial court ruled was admissible as "inextricably intertwined," and alternatively was admissible because its probative value outweighed any prejudicial value, was Brown's testimony that Simpkins agreed to be a driver, but refused to be a gunman in the UPB robbery,

32

because in the prior robbery he was a gunman and had not been paid enough to warrant the risk involved].

If the *pro se* movant's claim in Ground 3, liberally construed, is treated as asserting that appellate counsel was ineffective for failing to argue that the government engaged in prosecutorial misconduct on the basis by failing to disclose impeachment evidence, in violation of Brady v. Maryland, the claim would fail. In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court established three criteria a criminal defendant must prove in order to establish a violation of due process resulting from the prosecution's withholding of evidence. Specifically, the defendant alleging a Brady violation must demonstrate (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material. United States v. Severdija, 790 F.2d 1556, 1558 (11 Cir. 1986). Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. United States v. Alzate, 47 F.3d 1103, 1109-1110 (11th Cir. 1995), quoting, United States v. Bagley, 473 U.S. 667, 682 (1985); United States v. Stewart, 820 F.2d 370, 374 (11 Cir. 1987)(same).

Here, notwithstanding his argument that the government's failure to question Jenkins about the extrinsic matter [Simpkins' involvement in an earlier bank robbery], and the fact that Jenkins did not offer it, the movant Simpkins does not show how the failure to elicit such testimony from Jenkins would have served to undermine the credibility of Brown who testified against him at trial for the government. Also, Simpkins fails to show that the alleged failure would have changed the outcome of his trial. It follows that the government's failure to disclose that it did not intend to elicit testimony from Jenkins about Simpkins' extrinsic act [a prior bank robbery] would constitute a suppression of "material evidence," and a violation under Brady.

33

Under the circumstances of this case, it apparent that appellate counsel's alleged failure to raise a claim that the government should have disclosed that it would not ask Jenkins about knowledge of prior bank robberies by Simpkins, while it questioned Brown and elicited his testimony about such a prior act by Simpkins, was not deficient performance under <u>Strickland</u>. Even if, *assuming arguendo*, that counsel had attempted to raise such a claim, as Simpkins argues he should have, it is clear that Simpkins could not establish prejudice as a result of counsel's alleged omission. Simpkins does not show that there is a reasonable probability that, had the purported "impeachment evidence" been disclosed to the defense, the result of the proceeding would have been different.

Finally, in **Ground 4,** the movant Simpkins argues that he was subjected to a Fifth Amendment violation.

In support of this claim Simpkins argues that he had been suffering from Hodgkins Lymphoma, and that every officer of the court knew he had been hospitalized for treatment for 30 days before trial. He states that the Court knew of the illness, and granted pretrial motions for continuance, but thereafter did not inquire about his condition or illness, so as to make sure that he was competent to stand trial. Simpkins argues that, if competent, he has a right to assist his attorney in defending himself. Simpkins also argues that while counsel allowed him to testify at the suppression hearing, he had told counsel that he was taking powerful drugs for treatment of pain and inflammation, and counsel expressed concerns to him that if he were put on the stand, and testified at trial, he might give the appearance of being sedated or of not being competent to answer questions.

It is a fundamental requirement of Due Process that defendants be mentally competent upon entering a guilty plea or proceeding to trial. The test for determining a defendant's competency to stand trial is "whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding --

34

and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960); Tiller v. Esposito, 911 F.2d 575, 576 (11 Cir. 1990); Whitehead v. Wainwright, 447 F.Supp. 898, 900 (M.D.Fla. 1978). This requirement is a long-held tenet of the common law, arising out of its abhorrence of trials in absentia. Whitehead, supra, 447 F.Supp. at 902 (citations omitted). The mere presence of mental illness or other mental disability at the time of trial does not necessarily mean that a defendant is incompetent under the Dusky test. The mental illness or disability must have been so debilitating that the defendant was unable to consult with his lawyer and did not have a rational and factual understanding of the proceedings. See generally Bolius v. Wainwright, 597 F.2d 986, 990 (5 Cir. 1979).

The law is clear that the trial court has the responsibility to conduct a hearing for competency to stand trial, whether requested or not, whenever it reasonably appears necessary to ensure that a defendant meets the standard of competency set forth in Dusky. Drope v. Missouri, 420 U.S. 162, 180-81 (1975) (Relevant indicia of a defendant's incompetence include a defendant's irrational behavior, courtroom demeanor, or medical opinion).

Thus, the factors to be considered in determining whether the trial court violated the defendant's procedural due process rights by failing to sua sponte hold a competency hearing are: 1) prior evidence of the defendant's irrational behavior; 2) the defendant's demeanor at trial; and 3) prior medical opinions regarding the defendant's competence to stand trial. Id. Such analysis focuses on what the trial court knew at the time of the trial. Tiller, supra, 911 F.2d at 576; Reese v. Wainwright, 600 F.2d 1085, 1091 (5 Cir.), cert. denied, 444 U.S. 983 (1979).

When a court has a "bona fide doubt" as to the defendant's competence, it must sua sponte conduct a hearing on his competency to stand trial. Pate v. Robinson, 383 U.S. 375, 385, 387 (1966); Hance v. Zant, 696 F.2d 940, 948 (11 Cir. 1983); Zapata v. Estelle,

588 F.2d 1017, 1020 (5 Cir. 1979). This procedural guarantee, known as a "Pate hearing," protects the defendant's due process rights. Pate, supra, 383 U.S. at 385; Hance, supra, 696 F.2d at 948.

Because it is often defense counsel who is in the best position to discover whether the defendant's competency is questionable, failure of defense counsel to raise competency is compelling evidence that the defendant's competency was not really in doubt. Adams v. Wainwright, 764 F.2d 1356, 1360 (11 Cir.1985); see Reese v. Wainwright, supra, 600 F.2d at 1092.

Examination of the record, including Simpkins' §2255 motion and Reply/traverse, and supplement exhibits, reveals that Simpkins does not himself contend that he was incompetent to stand trial, or contend that due to incompetence he was legally unavailable to provide his attorney with assistance even if he did not himself testify. He simply argues that because he was ill with cancer and taking medications the Court was remiss in not engaging in an inquiry as to the state of his condition, and his capacity to stand trial. As discussed, supra, Simpkins has in fact argued that counsel was ineffective for refusing to allowing him to testify, a claim which would appear to undermine any claim of incompetence.

Nothing that occurred, as evidenced in the record, suggests that Simpkins was not legally competent to stand trial and assist counsel in his defense. There is no evidence of unusual behavior by Simpkins. Simpkins has stated that he took medications for pain and inflammation. There is no suggestion or allegation, however, that he was under psychotropic drugs or other medications affecting his ability to think, or comprehend what was happening during the course of his criminal proceedings, including the testimony given by witnesses at trial; and counsel never argued or filed a motion that Simpkins was not competent. Simpkins testified at length on August 15, 2005, at his suppression hearing, five weeks before trial, and that testimony appears lucid (Cr-DE#75, T/147-186). His trial commenced on September 21, and on September 22, 2005, the government presented its case, the defense conducted cross

examinations of the government witnesses, and the government rested its case. The jury was dismissed for the day, returned on September 23, 2005 to commence its deliberations, and reached its verdicts the same day. Sentencing was conducted on December 14, 2005. Examination of the transcripts of the suppression hearing at which Simpkins testified, and of the sentencing, at which he was addressed and spoke to the Court, reveals nothing to suggest that Simpkins was incompetent.[6]  As nothing in the record suggests that

---

[6]     At the sentencing, the Court asked Simpkins if he had had a chance to read the PSI, and Simpkins responded that he had just gotten a chance to go over it with his attorney, Mr. Spivack. Counsel explained that his client Simpkins had been in and out of the hospital; the Court responded, "I'm aware of that;" and counsel added, "when we send these things out, sometimes they don't make it." The Court asked if the defendant and counsel needed additional time to read the report. Counsel responded that he had gone over the PSI with Simpkins and that there were no objections, as it was accurate. The Court insisted that Simpkins have read the report, and took a brief recess for him to do so.  When going back on the record, the Court asked Simpkins if he had read the PSI, and if he had discussed it with counsel, and Simpkins responded affirmatively to both questions. Simpkins testified that to his knowledge he had no aliases, and counsel explained that this matter was brought to the Court's attention in case the Court intended to take into account the use of aliases listed in the PSI. The Court, before imposing sentence, asked Simpkins in open Court whether there was any legal cause as to why the sentence of the law should not be pronounced upon him, and counsel, with Simpkins at his side, responded that there was not.  The government proffered its arguments regarding the sentence which it believed should be imposed; and defense counsel responded. In doing so, Attorney Spivack mentioned that Simpkins had been suffering from Hodgkins Lymphoma for years, and urged that the 7 year sentence which had to be imposed would be far worse for Simpkins than for someone who is not ill, and urged the Court to grant credit for time served in state custody, from July 2004 to May 9, 2005, when state charges were dropped, after which he was arrested and taken into federal custody on May 18, 2005. The Court offered Simpkins the opportunity to allocute. Simpkins responded:

> Well, there's so much I want to say, your Honor. I really just-- I don't know your Honor. I'm tongue twisted and very disoriented by what happened.  I don't know. I don't know what to say, your Honor.

(Cr-DE#128, T/16)

The Court informed him, that he was not required to say anything, but that I he wished to say something about his sentencing or the sentence to be imposed, this would be his opportunity to do so, and that it was up to him if he wanted to say something or not. (Id., T/17). Simpkins then addressed the Court again, stating:

> There's just one thing I don't understand, your Honor. You know, if I was illegally arrested, how could I go as far as trial, that's the only thing I don't understand. The Justice system know that.  So if you could help me

the trial court was put on notice that Simpkins' competence was in question, it does not appear that there was any reason for the Court to inquire, let alone hold a hearing, regarding whether Simpkins was able to assist his attorney in his defense, and competent to stand trial.

It is apparent, therefore, absent any indicia of incompetence, that if it had been raised on direct appeal, the Fifth Amendment claim, as framed by the movant Simpkins, would have been a non-meritorious. Consequently, the movant cannot establish prejudice arising from counsel's alleged deficient performance for failure to raise the Fifth Amendment claim as an issue on direct appeal, and he is entitled to no relief on this claim.

## VI.   Conclusion

It is therefore recommended that the movant Nathaniel Simpkins' motion to vacate, pursuant to 28 U.S.C. §2255, be denied.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated this 6th day of April, 2009.

UNITED STATES MAGISTRATE JUDGE

---

understand that, I really could appreciate it.

(Id., T/17).  The Court advised that Simpkins would have to address that matter with his attorney.  Thereafter, after further discussion between the government, the court, and defense counsel regarding factors impacting on the sentence to be imposed (T/17-20), and the imposition of sentence (T/20-24), the Court asked if there were objections (T/25).  The government objected that the sentence, which took into account time served in state custody for the same offense, as well as Simpkins' illness, was below the guidelines range.  (Id.) When the Court asked if the defense had any objections, counsel responded, "No, your Honor," and the defendant Simpkins stood mute, and said nothing.  (Id.).

```
cc:  Nathaniel Simpkins, Pro Se
     Reg. No. 64246-004
     FMC - Lexington
     Federal Medical Center
     P.O. Box 14500
     Lexington, KY 40512

     Jaime A. Raich
     Assistant United States Attorney
     99 N.E. 4th Street
     Miami, FL 33132

     The Honorable Joan A. Lenard,
     United Stated District Judge
```