## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-21332-CIV-LENARD/WHITE
(Related Criminal Case: 05-20318-CR-LENARD)

**NATHANIEL SIMPKINS**,

        Movant,

vs.

**UNITED STATES OF AMERICA**,

        Respondent.

_____/

## ORDER ADOPTING REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE (D.E. 18); DENYING MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 (D.E. 1); AND DISMISSING CASE

**THIS CAUSE** is before the Court on the Report and Recommendation of Magistrate Judge Patrick A. White ("Report," D.E. 18), issued on April 7, 2009. In his Report, Magistrate Judge White recommends that the Court deny Movant's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 ("Motion," D.E. 1). Movant filed his Objections to the Report on April 27, 2009 (D.E. 19). Having reviewed the Objections and the record, the Court finds as follows.

### I.    Background

The following facts of Movant's underlying conviction are taken from the Magistrate Judge's Report and are not meaningfully objected to by Movant.

On April 15, 2005, Movant Nathaniel Simpkins - along with three co-conspirators, Curtis Brown, Tinnell Prentice Irving, and Anthony Donnell Rose - was charged by

Indictment in Case No. 05-20318-Cr-LENARD with conspiracy to commit armed bank robbery (Count 1) armed bank robbery (Count 2), and possession of a firearm during commission of a felony (Count 3).  (Indictment, CR-DE#1[1]). The offenses charged related to robbery of Union Planters Bank ("UPB"), in Hialeah, on March 23, 2004. In excess of $30,000.00 was taken.

### A.   Movant's suppressed statement

Based on a confidential informant's tip, and as part of an investigation into a series of bank robberies, Movant was stopped, transported to a police station, and questioned on July 9, 2004, prior to his indictment. He gave statements, including one implicating himself in the 3/23/04 UPB robbery.   On June 15, 2005, following his indictment, Movant moved to suppress his statements (See Cr-DE#35). On August 15, 2005, a suppression hearing was held before the Honorable Theodore Klein, United States Magistrate Judge. (Transcript, Cr-DE#75). Based on Magistrate Judge Klein's recommendation, and details in the transcript, the Court found that the circumstances under which Movant was detained on July 9, 2004, and questioned, leading to a confession, constituted an unlawful seizure of his person, in violation of the Fourth Amendment, and granted the motion to suppress his statements (Order, Cr-DE#76).

---

[1]     In this Order, citations to the criminal docket in Case No. 05-20318-Cr-LENARD will be indicated by "CR-DE."  Citations to the docket in the instant case, 08-21332-Civ-LENARD, will be indicated by "CIV-DE."

### B.    404(b) evidence regarding Movant's involvement in prior bank robberies

Prior to trial, the government gave Movant notice, pursuant to F.R.E. 404(b), of its intent to introduce evidence that on March 3, 2004, just 20 days before the UPB robbery, Movant had participated in the robbery of another bank. Movant moved to exclude the evidence, arguing failure of the government to identify its reasons for offering the evidence and its relevancy. The government responded that the close temporal proximity of the two robberies was probative of identity, knowledge and absence of mistake. The Court denied the motion to suppress the proposed 404(b) evidence, without prejudice, noting that its relevancy would depend on the theory of defense presented at trial. Movant, at trial, objected to introduction of testimony about the 3/3/04 bank robbery, and the government argued that it intended to offer testimony by Curtis Brown, Movant's co-conspirator, that Movant agreed to be a driver in the UPB robbery, but did not want to be a gunman, because in the earlier robbery he had been a gunman and felt that the small amount he was paid did not justify the danger he would face if he agreed to be a gunman in the UPB robbery. This, the government argued, explained the relationships of the parties, and therefore was not extrinsic evidence subject to exclusion under Rule 404(b). The district court found that the evidence regarding the earlier offense was "inextricably intertwined" with the charged offense and noted, in the alternative, that the probative value of the evidence outweighed any prejudicial value, and overruled the objection.

### C.    The trial

The government put on a number of witnesses at trial. Rolando Riera, Jr., a UPB teller, testified that he was working as a teller at the drive-in window at UPB on 3/23/04 when he saw four black males in a mint-colored Saturn car drive through one of the lanes, and without stopping, continue onto the street. He was able to see the driver and the man sitting in the back passenger seat behind him. Riera described the Saturn driver - whom Jeffrey Jenkins, a co-conspirator testifying in exchange for immunity, later identified as being Movant - as a heavyset, Black male, with dreadlocks, and testified that he had focused on him because of his hair.

Jenkins, who testified that he entered the bank and held a gun to Riera's head and took money from the tellers' drawers, testified that shortly before the robbery, Movant, who was his driver for the UPB robbery, had driven through a lane in front of the UPB drive-through window. Jenkins saw that the teller was looking out of the window at them. At trial, Jenkins identified Movant in the courtroom, and testified that his appearance from the day of the robbery had changed, because Movant, who had "long dreads" on the day of the UPB robbery, had cut them off.  Jenkins was shown a photograph of Movant, which was introduced as Government Exhibit 2, and testified that it showed Movant as he had appeared on the day of the bank robbery.

Riera also testified that before seeing the Saturn drive through the lane, he had heard customers inside the bank talking among themselves about a suspicious vehicle with four

Black males in front of the bank. It initially worried him, but he went back to his seat at the drive-through window. It was then that he saw the car pass by. He testified that, at that point, one of the other employees started to write an E-mail message to security, but within about one minute, Black males entered the bank, announced it was a bank robbery, and told everyone to get down.

Riera further testified that once the black males were inside the bank, one of them, Jenkins, put a gun to his head, opened the teller drawer, and started to put money in a bag. Jenkins then told him to help put money in the bag, and Riera complied. While doing so, Riera retrieved a dye pack from drawer and put it along with money into the bag. Riera described a dye pack as a strapped bundle of $20 bills with dye inside, which blows up outside of the bank, staining stolen currency so that it can be traced. Riera then was instructed by Jenkins to follow him, and went to the other teller drawers and emptied them for Jenkins. Jenkins thereafter told Riera to get down on the ground, and after he did so, Riera was able to get into one of the teller stalls and press the silent alarm.

Jessica Alonso, a UPB teller supervisor, testified that she was working as one of two lobby tellers when she heard another teller scream as two gunmen entered the bank. She testified that one jumped over the counter, that although she was on the ground she looked and could see his eyes, and saw the gun in his hand.  She believed that the gunmen were black. She also testified that, before the men entered the bank, the other teller had been told by a customer that there was a suspicious vehicle outside with three black men in it. Alonso

testified that they went to the manager's office, and when she told him that, he instructed her to make a report to the security department. Alonso testified that she was aware that the car was teal colored, but that she had not actually seen it.

Jenkins testified that he was one of the two gunmen who entered the bank. Irving was the other. Jenkins testified that he held a gun to the teller's head. Jenkins also testified that, before the robbery, Movant was present in the light blue-colored four door car borrowed from Brown's mother, Judy Russell, when Jenkins loaded a gun and gave it to the other gunman, Irving, for Irving to use in the UPB robbery.

Jenkins testified that Movant drove Mrs. Russell's vehicle as a get away car, and, after they left the bank and Movant went back through the drive-through to the street, when there was a sudden impact as the dye pack exploded, burning him and some of the money, and spewing dye on him and in the back seat of the car. Movant was going to stop, but Jenkins told him to roll down the windows, and to keep going. They proceeded to Browns' mother's (Mrs. Russell's) house, where they used her washing machine to wash some of the money, but it didn't come clean. When asked who was there at the time, Jenkins testified at trial that, in addition to him, there was Movant, that "(t)here was Tinnell, my gunman, who was with me...," "Anthony, which we called him Little Leagues," and "Anthony's brother, Jimmy." Jenkins testified that they all participated in the attempt to launder the money, but that they weren't too successful on the first day, using Mrs. Russell's washing machine, because it didn't come clean. Jenkins testified that they then went to the house of Curtis Brown's

cousin, "Anthony, Little Leagues," where they continued their attempts to clean the money, first using Oxyclean, and then resorting to kerosene. Since it was getting late, they decided to go home and they all returned the next day, to try to finish cleaning the money with kerosene. Jenkins testified that everybody got some of the money from the robbery, including Movant who got about $5,000.00.

Jenkins testified that in July 2004 he was questioned by police and confessed his involvement in the UPB robbery, and that he had told them that Movant drove one of the cars used in the robbery. On direct examination, Jenkins also testified that he hoped to receive a reduction in a 47½ year sentence he had received for other bank robberies, in return for his cooperation with the government in regard to the UPB robbery.

Jenkins was cross-examined by Movant's trial attorney about his desire to possibly avoid a minimum mandatory 25 year sentence, by providing substantial assistance. On re-direct the government elicited Jenkins' testimony that in July 2004, at the time that he confessed to law enforcement officers, and implicated Movant in the UPB robbery as being his driver, he had not been charged by officers, he had no agreement with the government, and did not know for what bank robberies he might be charged.

Curtis Brown - who, prior to his 9/22/05 testimony in Movant's trial had himself plead guilty two counts 2 and 3 in the UPB case on 9/13/05, and ultimately was sentenced on 12/21/05 - testified that in organizing a team for the UPB robbery he needed two gunmen, and two get away cars. One car would carry the gunmen and cash as they fled from bank, and

the second car would serve to protect the first one, by blocking traffic, if necessary. Brown had checked out the UPB lobby and saw no security guard, and no cages or glass windows that would keep him from climbing over the teller counter to get the money. Brown testified that he collaborated with Jenkins, and decided they needed a minimum of five people. Brown testified that he could not drive because he had no license. Brown, like Jenkins, testified that Movant refused Brown's request/proposition that he act as a gunman, but agreed to be a driver. Brown's testimony indicates that at the time of the get away, the main get away driver, Movant, had the two gunmen, Jenkins and Irving, in Mrs. Russell's Saturn. The other vehicle, a Dodge truck which belonged to Jimmy O'Neal, had Brown in the back seat, Brown's cousin Jimmy [O'Neal] as the driver, and Brown's other cousin Anthony [Rose] in the front passenger seat.

Brown testified that during the robbery he stayed in the truck across the street. A police car was in the vicinity, and Brown phoned Jeff Jenkins in the Saturn to warn them, and ask if they wanted to hold off, or pick another bank. Jenkins said no, but that they would circle around. When Brown called on his cell phone again, he spoke with Movant, who said that the others had just gone into the bank. Brown told Movant to stay in contact by phone, so that they could be ready to leave right behind them. Shortly thereafter Movant told Brown that the gunmen were coming out of the bank. Brown testified that the Saturn pulled out from the front of the bank, and that he was behind, in the truck, with approximately four cars in between. Brown testified that as he looked forward, and up in the air, he could see a "red

8

cloud." When asked if it appeared to be coming from the Saturn, Brown responded, "No. I didn't see it coming from the Saturn. I just seen a red cloud up in the trees. It looked strange to me." Brown communicated with the Saturn by phone, and Jenkins told him that there had been a dye pack in the money bag. Brown called back, and someone said that Movant had gotten sick to his stomach. Brown suggested pulling over if they couldn't see, but they said, No, that they would keep going. Brown testified that all of them  - Brown himself, Movant, Irving, Jenkins, Anthony Rose, and Jimmy O'Neal - then went to his mother's house. Shortly after arriving there, however, Jimmy left, to go pick up his daughter, or do some personal business. Brown testified that he and the others used his mother's washing machine to try to launder the currency, but he/they did not show her the money. When the money didn't come clean, they put it in a bag, and went into Brown's sister's room to smoke some drugs. Brown testified that they later went to Rose's house and put the money in a dryer.

Brown's mother, Mrs. Russell, testified that, on the day in question, her son, Rose, Movant, and Jenkins had come to her house. One of them had a bag in his hand when they arrived. She testified that at one point she went outside because a neighbor had called her; and then she walked back into her house because she smelled the odor of dope being smoked in her daughter's room, and she started fussing with the men. Then she went back outside because her neighbor called and said there were people outside in the back yard, and when Mrs. Russell went there she could see stuff that looked like red dye running from her washing machine, which was located in back of the house.

9

She testified that after this she left, and went to church, and that when she returned, some of the men were in the back room smoking. Mrs. Russell then went to the kitchen, to put something in the garbage, and saw that there was a bag in her garbage can, with something red on it. When she asked "What is this in my garbage can?", Movant said, "Oh, my bag," and he took it and walked out the door with it. Mrs. Russell also testified that, three days later, when her daughter brought it to her attention, she discovered that the front seat of her car was torn, and that "[i]n the back right-hand side of the back seat, there was a lot of red stuff all over the seat." Russell testified that when she asked her son, Brown, about it, he told her that "Jeffrey [Jenkins] had some paints back there," and that "they was gonna get it clean."

On cross-examination, Brown was questioned about the agreement pursuant to which he was pleading guilty to two counts of the indictment, with the government's agreement to dismiss the other count, and questioned him about his motivation to lie. Brown testified that when he had first spoken to the police he did not tell them he was involved in the robbery, but he maintained that he had not lied to them. He testified that he simply hadn't told them everything. Brown testified that he did not recall telling the police that he and his cousin Anthony were across the street in a truck, but were unaware that a robbery was occurring. Counsel then presented Brown with a copy of a report of his police interview, and Brown responded that the report consisted of the agents' impressions of what he had said, rather than his statements themselves, and said that he had not lied. After Brown's testimony, at the close

of the government's case, Movant's attorney stated that in order to impeach Brown's testimony, he intended to call an agent who had been present during Brown's interview. Counsel expected that the agent would testify that Brown had made false statements to police.

The government argued, in response to counsel's request, that the written report referenced during Brown's cross-examination indicated that Brown had admitted involvement with the bank robbery. The government argued that the agent's testimony would be improper impeachment, since Movant, through counsel, had not show that Brown's statements were inconsistent. The government requested clarification on which statements Movant intended to impeach Brown. The defense replied that it was its impression that both Rose and his cousin, Brown, had given police the same false story when they first met with officers, i.e., that they had not been involved in the robbery.  Defense Counsel argued that Rose, Brown's cousin, and Brown had told the police that they weren't involved in any bank robbery, but just happened to be in this truck and just happened to be at that mall, and had seen Jeff Jenkins come running out of the bank and jump in the car, and then, after the car drove off, this red plume of smoke came out of it. See ROA, Cr- DE#126, T/292-93.

Defense counsel argued that the police report, when read in conjunction with Rose's statement to police that he and Brown were not involved in the robbery, showed that Brown had initially denied involvement in the UPB robbery. Defense counsel further argued that such a reading conflicted with Brown's trial testimony that he had not lied to law

11

enforcement. The pertinent portion of the police report, which was read into the trial record

by Defense Counsel, was as follows:

> Rose came by Brown's house in an old two-toned Dodge truck, possibly a Prospect, driven by someone unknown to Brown.
>
> Brown rode in the back of the truck and Rose was seated in the front passenger seat. The three individuals were following Jeff Jenkins, who is a passenger in Judy Russell's car driven by Movant.
>
> Brown advised that Jenkins had lived in Hialeah at one time and was familiar with the area. Brown recalled seeing a pawn shop and a Latin American Cafeteria in the same area as the Union Planters Bank.
>
> Brown recalled seeing the Saturn exiting the bank parking lot with a red cloud billowing out of the Saturn. Jenkins called Brown on the cellphone and told Brown that they needed a washing machine.
>
> Brown asked Jenkins why, at which point Jenkins suggested that they go to Brown's mother's house.

(ROA; Cr-DE#126, T/293-294).

The Court, upon it's examination of the report, found that it contained no indication

that Brown had denied involvement with the robbery. In so ruling, the Court stated:

> I don't see anywhere in the statement where Brown initially stated to the officers that he was not involved in the robbery and he was seated at the mall.
>
> In the second paragraph, he says, "Jeff Jenkins woke Brown up by banging on his front door in his bedroom window. Jenkins told Brown that he wanted to, quote, 'do dirty,' which Brown took to mean that Jenkins wanted to do a robbery, and that Brown had to get someone to drive," which is what Brown testified to. That's what he told the detectives, that they had agreed to rob a bank.
>
> The only area that he seems to have contradicted what was in the statement is that "Brown recalled seeing the Saturn exiting the bank parking lot with a red

cloud billowing out of the Saturn," and he testified that he actually saw the red cloud in the sky and not coming out of the car. Is that the area you wanted to ask him about?

(ROA; Cr-DE#126, T/296-297). Counsel responded, "No," that the discrepancy about the red cloud was not what he wanted to ask about, and said that "I'm reading the report differently than the Court is and the Government is." The Court then found that there was no basis for the defense to call the FBI Agent for impeachment purposes.

The Court determined that the defense intended to call no other witness, and defense counsel, confirming that the government had rested its case, moved for a judgment of acquittal based on the evidence. The government argued that the jury had heard that a bank robbery was committed on the date and place charged in the indictment, that from multiple witnesses with no motive to lie, they heard that Movant was involved in the robbery. Two witnesses had identified him as a get away driver, and a third identified him as assisting after the fact in laundering the money. The government further argued that unless the defense was arguing that the witnesses should be stricken as incredible as a matter of law, there was sufficient evidence to go to the jury. Defense counsel had nothing further, and the Court ruled that taking the evidence in the light most favorable to the government, a reasonable jury could find the defendant guilty of the crimes charged in the indictment, and that they had presented evidence as to all the elements of the counts in the indictment. The Court denied the motion for judgment of acquittal. The Court admonished the jury that Movant was only being tried for the offenses that were charged in the indictment.

13

The jury found Movant guilty on all three counts; the district Court sentenced him to a 114 month term of imprisonment.

### D.   The direct appeal and the Motion

Following his conviction, Movant pursued a direct appeal, Eleventh Circuit Case No. 05-17167, arguing that the District Court erred by:

> (1) admitting testimony, as inextricably intertwined with the instant charges, that Movant had previously participated in a bank robbery other than the one charged in the indictment;
> (2) denying his motion for judgment of acquittal, in which he argued that the evidence, including the testimony of two co-conspirators whom Movant says were not credible, was insufficient to convict him;
> (3) denying his request to call certain witnesses in order to impeach his codefendant's testimony; and
> (4) overruling his objections to the government's closing arguments.

(See Cr-DE#156). The Court of Appeals, in an unpublished opinion, United States v. Simpkins, 240 Fed.Appx. 334, 2007 WL 2050914 (11th Cir. 2007), affirmed Movant's conviction on July 18, 2007, issued as its mandate on August 16, 2007. (Cr-DE#156).

The instant Motion was signed under penalty of perjury on April 28, 2009, mailed on April 29, and timely filed with the Clerk of this Court on May 6, 2008.   In his Motion, Movant raises four grounds for relief: (1) ineffective assistance of counsel; (2) malicious prosecution; (3) violation of due process; and (4) violation of his fifth amendment rights.  As to his ineffective assistance of counsel claim, Movant makes eight sub-claims:

> a.      "Counsel should have challenge[d] the Indictment," since evidence that was considered by the grand jury in returning its indictment - Movant's statements to police on July 9, 2004, admitting involvement in the Union Planters Bank robbery - was ultimately suppressed because circumstances

under which Movant was detained and questioned amounted to a Fourth Amendment violation.

b.      "Counsel should have filed a motion to dismiss the Indictment due to the...Fourth Amendment violation," because evidence - Movant's inculpatory police statement - which formed a basis for the Indictment was suppressed and was not "available for the trial jury to examine...," and according to Movant there was therefore "no evidence to support the indictment."

c.      "Counsel should have argued and filed a motion on the fruit of the poisonous tree doctrine against everything that was used against Movant at trial," because "everything that was used was obtained after July 9, 2004," the date when "Agent James B. Hughes misled local police" by telling them "in reasons he explained that he had probable cause for the arrest of the Defendant."

d.      "Counsel failed to introduce evidence of reasonable doubt that was present within the discovery the government provided." According to Movant, this "evidence of reasonable doubt" was that there existed a person named Jerry Lester Ponder, identified as being 6'1" tall, 210 pounds, with "very long dreads," who was a good friend of Movant's co-defendant Curtis Brown, and that Ponder and Brown "went to jail together in a drug sting shortly after the crime [the Union Planters Bank Robbery] was committed." Movant Simpkins argues that if counsel had introduced this as evidence at trial, it "could have put doubt in the jury's head that the accused [Simpkins] did not commit the crime [the robbery at Union Planters Bank], and that the government's witness [Brown] was protecting his friend [Ponder]."

e.      "Counsel lied to Simpkins by stating that he could not impeach Curtis Brown with the transcripts of the audio recorded confession Curtis Brown gave the police;" and, according to Movant, counsel should have attempted to impeach Brown, because Brown testified that rough notes on an FBI 302 form were merely an interpretation of what he [Brown] had told Agents James B. Hughes and Robert Erickson on 8/26/04 at 3:20 p.m., while he [Brown], at 8:50 p.m. on 8/26, "provid[ed] police with a recorded audio statement completely excluding himself from all Bank Robbing activities."

f.      Counsel "should have objected to the answer of Government witness Curtis Brown on page 265 of [trial] transcripts concerning [Brown's] plea agreement and providing information, whether in interviews before a Grand Jury, or appearing at such Grand Jury proceeding," in order to impeach Brown for perjuring himself; because, according to

Movant, Brown, when he was asked by police about bank robbery activities, had "express[ed] that he knew the individuals involved with the conspiracy and that he knew certain information about the conspiracy [to rob Union

15

Planters Bank]", yet Brown had told police on August 26, 2004, that "[I] don't do shit like that;" and government information which was disclosed on June 17, 2005 showed that Brown had been the getaway driver in a bank robbery one month before the Union Planters Bank robbery with which he, Simpkins, and others were charged.

g.      "Counsel refused to allow Defendant [Simpkins] to testify."

h.      "Counsel failed to introduce evidence that the government witness Curtis Brown committed perjury."

Movant's second claim, malicious prosecutions, alleges that government agents lied in order to prosecute Movant.  Movant's third claim, due process, alleges that the government failed to disclose impeachment evidence as to one of its witnesses.  Movant's fourth claim, violation of the Fifth Amendment, alleges that the Court knew that Movant was incompetent to stand trial but still let the trial proceed.

## II.      The Report

Magistrate Judge White rejected all of Movant's claims.  As to claims 1(a), 1(b), and 1(c), Magistrate Judge White found that presume, in conclusory fashion, without any support, that once his statements to police were suppressed, there was no probable cause for the government to believe that he had committed an offense or offenses charged in the indictment, and that all other evidence in the case was tainted.  However, as detailed in the background section above, there was ample evidence linking Movant to the crime, and Movant made no showing that this evidence flowed from Movant's suppressed statement such that it should also be suppressed as "fruit of the poisonous tree."  As to Movant's argument in claim 1(d), Magistrate Judge White found it questionable whether evidence that Brown and Ponder knew each other and were arrested in a drug case together approximately

one week after the UPB robbery would be admissible, and, even if it were, Magistrate Judge White found that it would not have altered the impact of the proceedings and therefore Movant suffered no prejudice.   As to claims 1(e) and 1(f), Magistrate Judge White found that there was no merit to Movant's claim that his counsel was ineffective in impeaching Brown, as the record reflects that he did attempt to impeach Brown as well as another of Movant's co-conspirators, Jenkins.   As to claim 1(f), Magistrate Judge White found that Movant's bare bones allegation that he was prevented from testifying by his counsel was insufficient to support a viable claim, as there was no factual support of his claim and no way for him to demonstrate prejudice.   As to claims 1(h), Magistrate Judge White found that it was simply a restatement of Movant's other grounds attacking counsel's competence for alleged failure to impeach Brown, and was similarly without merit.   As to claim Movant's second claim, Magistrate Judge White found that Movant's convoluted argument fails because any statements taken from Movant on July 9, 2004 were suppressed, and there was ample other evidence to indict and prosecute Movant. As to Movant's third claim, Magistrate Judge White found that,

> notwithstanding his argument that the government's failure to question Jenkins about the extrinsic matter [Simpkins' involvement in an earlier bank robbery], and the fact that Jenkins did not offer it, the movant Simpkins does not show how the failure to elicit such testimony from Jenkins would have served to undermine the credibility of Brown who testified against him at trial for the government. Also, Simpkins fails to show that the alleged failure would have changed the outcome of his trial.

(Report, CIV-DE 18 at 33.)  Finally, as to Movant's fourth claim, Magistrate Judge White

finds that there was no evidence to support a claim that Movant was incompetent to stand trial and the record affirmatively demonstrates that he was competent.

## III.   Discussion

Movant has objected to all of Magistrate Judge White's findings.  These objections are either irrelevant or merely rehash the arguments he made in his Motion and earlier filings. Nonetheless, the Court will review Movant's Objections to Magistrate Judge White's Report.

### A.   Claims 1(a), 1(b), 1(c)

Movant makes several convoluted arguments suggesting that all the other evidence adduced at trial stemmed from his suppressed statement. Essentially, Movant contends that his co-conspirators, and his co-conspirator's mother, Mrs. Russell, were solicited to testify against him by the government after his statement was suppressed, because the government had no other evidence against him.  This bald allegation is insufficient to support a claim of ineffective assistance of counsel.  Simply put, there was ample evidence to support Movant's conviction, including the testimony of the bank tellers, the testimony of his co-conspirators, and the testimony of Mrs. Russell, and there is no indication that this evidence stemmed from his suppressed statement.

### B.   Claim 1(d)

The Court agrees with Magistrate Judge White that Movant cannot demonstrate prejudice as to Claim 1(d).  The Court finds that the fact that one of Movant's co-conspirators associated with another black male with dreadlocks, and the two of them were

caught attempting a drug deal with money possibly coming from the bank robbery, would not be enough to create a reasonable doubt in the mind of the jury that Movant was not guilty, especially in light of the other, overwhelming evidence against Movant.

### C.    Claims 1(e) and (f)

The Court agrees with Magistrate Judge White that Movant's counsel made a reasonable attempt to impeach Movant's co-conspirators, Brown and Jenkins.  Movant's difficult-to-follow objections to the Magistrate Judge's findings in Claims 1(e) and (f) do not demonstrate how his counsel might have more effectively impeached his co-conspirators.

### D.    Claims 1(g)

The Court agrees with Magistrate Judge White that Movant has not made a credible argument that his counsel refused to allow him to testify.  Movant has provided no evidence in support of his claim.  Additionally, in light of the overwhelming evidence against him, Movant has not demonstrated that the result of his trial would have been different had he taken the stand.

### E.    Claims 1(h)

The Court agrees with Magistrate Judge White that Claim 1(h) is essentially a restatement of Movant's other ineffective assistance of counsel claims.  Movant contends that his counsel failed to introduce evidence that Brown committed perjury.  However, as Magistrate Judge White stated in the Report, the record demonstrates that Movant's counsel attempted to undermine Brown's credibility and demonstrate false testimony, both by

19

attempting to show that he made custodial statements to police that were allegedly inconsistent with his trial testimony, and by attempting to show through cross-examination of Brown that he was motivated to lie, by virtue of benefits he would derive from cooperating with the government and testifying against Movant.  As such, Movant's claim is without merit.

### F.     Claim 2

Movant's objections to the Magistrate Judge's recommendation that his second claim for malicious prosecution be denied are simply a rehashing of his earlier claims that his indictment was defective once his July 9, 2004 statement was suppressed.  As stated above repeatedly, there was ample other evidence upon which to indict Movant and there is no indication that this evidence derived from his suppressed statement such that this evidence should have been suppressed, too.

### G.     Claim 3

In his objections, Movant contends that the government committed a <u>Brady</u> violation, when it failed to disclose that Jenkins had "changed his mind" about testifying regarding Movant's involvement in a prior robbery, and that, if the government had asked him about his change of heart, it would have demonstrated that Brown was lying about implicating Movant in an earlier robbery.  The problem with Movant's argument is that he has not shown that Jenkins would have testified that Movant was <u>not</u> involved in the prior robberies - he simply did not testify on the issue at all.  Additionally, as pointed out by Magistrate Judge

White, the Movant has not demonstrated how the government's disclosure that it did not intend to introduce evidence of Movant' prior involvement in a bank robbery through Jenkins would have proved that Brown was lying.

### H.    Claim 4

Movant objections to Magistrate Judge White's findings as to Claim 4 fail to address the lack of evidence regarding his alleged incompetence to stand trial.  As the Court concurs with Magistrate Judge White's conclusion that Movant was competent to stand trial in light of the record and Movant's failure to affirmatively allege that he was incompetent, this claim fails as well.

Accordingly, Movant's Objections fail, and it is hereby **ORDERED AND ADJUDGED** that:

1.    The Report of Magistrate Judge Patrick A. White (D.E. 11), issued on February 9, 2009, is **ADOPTED**.

2.    The Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (D.E. 1), filed on or about October 9, 2008, is **DENIED**.

3.    This case is **CLOSED**.

4.    All pending motions not otherwise ruled upon are hereby **DENIED** as moot.

21

**DONE AND ORDERED** in Chambers at Miami, Florida this 29th day of June, 2009.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**